Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213

PETER GRUMBLES
THE LAW OFFICES OF JOHN E. DUNLAP
3294 POPLAR AVENUE
#240
MEMPHIS TN 38111

EXHIBIT
2

Lincoln Financial Group®

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5704

August 29, 2019

Peter Grumbles
The Law Offices of John E. Dunlap
3294 POPLAR AVENUE
#240
MEMPHIS, TN 38111

RE: Long Term Disability (LTD) Benefits
Nike, Inc.
Claim #: 7164999
Claimant: Shanna Richardson

Dear Peter Grumbles:

We reviewed your appeal request for Long Term Disability (LTD) benefits, on behalf of Shanna Richardson, and maintained the decision to deny benefits beyond May 15, 2019.

**Initial Claim Decision**

Ms. Richardson submitted a claim for her absence from work as of September 22, 2016, as a result of neck and back pain. Her LTD benefits began on March 23, 2017. Therefore, the change in definition of disability occurred on March 22, 2019, and to receive benefits beyond 24 months Ms. Richardson must be disabled from Any Occupation as defined in the Policy. Ms. Richardson continued to receive benefits beyond the change in definition. However, benefits beyond May 15, 2019, were denied as the evaluation concluded Ms. Richardson was no longer disabled as defined by the Policy.

The basis for the decision was outlined in a letter dated May 16, 2019. Ms. Richardson was provided an opportunity to request an appeal review of the denial, stating the reasons why she felt that her claim should not have been denied, and submit additional information to support her claim. Specifically, she was advised to submit the following information:

> *"Office visit notes, diagnostic test results, procedure reports, physical therapy treatment notes, and any other medical documentation in which provides evidence of restrictions and limitations of such severity to prevent you from performing any occupation. You should also provide any additional information that you feel will support her claim."*

**Appeal**

On May 22, 2019, we received a letter from your office regarding the appeal of Ms. Richardson's LTD benefits. The letter indicated there was a notice of appeal attached along with a letter from her treating doctors stating Ms. Richardson is unable to return to work due to cervical radiculopathy. In support of Ms. Richardson's claim, we received a notice of appeal from your office.

We called your office on June 19, 2019 and spoke to the secretary. We advised we had no authorization on file allowing Lincoln Financial Group to release information to their office. We also stated the appeal letter received on May 22, 2019 stated there was a letter from Ms. Richardson's physician. However, there was no letter attached. Your secretary advised she would speak to Attorney Dunlap and the information would be submitted.

On June 20, 2019, we called your office again and spoke to Attorney Dunlap. We advised we required an authorization allowing Lincoln Financial Group to release information to their office. We also explained to Attorney Dunlap the letter from Ms. Richardson's physician was not included in the May 22, 2019 fax. Attorney Dunlap stated he would fax the information right away.

We called your office again on June 21, 2019. We spoke to Richard who stated Attorney Dunlap was in to in the office. We explained we were missing the authorization and a letter from Ms. Richardson's physician. We advised of our attempts to receive the missing information and advised we did get Ms. Richardson's signed authorization, but we did not receive the letter from her physician. Richard advised he would give Attorney Dunlap the message.

On June 28, 2019, we called your office and left a voice message stating we were still missing the physician's letter. We provided our phone and fax number.

We also wrote to your office on June 28, 2019, informing your office we required additional time to render a determination on Ms. Richardson's LTD appeal. The letter outlined that under the Employee Retirement Income Security Act of 1974 (ERISA), an appeal determination should be rendered within 45 days of receipt of the appeal, unless there are special circumstances which require a delay in making an appeal determination. If additional time is needed, ERISA allows for a 45-day extension to evaluate and render an appeal decision. The letter stated we required additional information which was necessary to render a full and fair determination on Ms. Richardson's LTD appeal for benefits under the Nike, Inc.'s LTD Policy. We requested you please provide the letter from Ms. Richardson's physician that was referenced in the appeal letter, and any other records from her treating providers from May 15, 2019 through the present. The letter indicated under ERISA, the period for making a benefit determination shall be tolled (suspended) from the date of the letter until the date we received the requested information. Upon receipt of the necessary information, we would promptly render a determination on Ms. Richardson's appeal. If the additional information was not received by July 12, 2019, we would render a determination based on the information contained in her file.

On July 8, 2019, we received medical records from your office. The information submitted in support of Ms. Richardson's appeal included:

- January 16, 2014 Ambulatory Encounter Report from Baptist
- April 2, 2014 Ambulatory Encounter Report from Baptist

- April 30, 2014 Ambulatory Encounter Report from Baptist
- June 17, 2014 Ambulatory Encounter Report from Baptist
- July 24, 2014 Ambulatory Encounter Report from Baptist
- November 21, 2014 Ambulatory Encounter Report from Baptist
- November 25, 2014 telephone note from Baptist
- December 4, 2014 telephone note from Baptist
- December 18, 2014 telephone note from Baptist
- August 27, 2015 Ambulatory Encounter Report from Baptist
- December 1, 2015 Ambulatory Encounter Report from Baptist
- February 17, 2016 Ambulatory Encounter Report from Baptist
- May 24, 2016 Ambulatory Encounter Report from Baptist
- May 24, 2016 X-ray of cervical spine
- May 31, 2016 telephone note from Baptist
- June 9, 2016 Ambulatory Encounter Report from Baptist
- June 9, 2016 office note from Catherine Phelps, NP
- July 6, 2016 telephone note from Baptist
- July 12, 2016 Ambulatory Encounter Report from Baptist
- July 13, 2016 telephone note from Baptist
- July 14, 2016 telephone note from Baptist
- July 18, 2016 telephone note from Baptist
- August 9, 2016 X-ray of cervical spine
- September 22, 2016 Ambulatory Encounter Report from Baptist
- September 23, 2016 telephone note from Baptist
- September 28, 2016 Ambulatory Encounter Report from Baptist
- October 3, 2016 telephone note from Baptist
- October 4, 2016 telephone note from Baptist
- October 11, 2016 telephone note from Baptist
- November 2, 2016 MRI of the cervical spine
- January 31, 2017 telephone note from Baptist
- January 31, 2017 Ambulatory Encounter Report from Baptist
- February 9, 2017 office note from Dr. Todd Fountain
- February 10, 2017 telephone note from Baptist
- March 1, 2017 telephone note from Baptist
- March 3, 2017 telephone note from Baptist
- March 17, 2017 telephone note from Baptist
- May 30, 2017 Ambulatory Encounter Report from Baptist
- July 13, 2017 Ambulatory Encounter Report from Baptist
- July 14, 2017 telephone note from Baptist
- September 21, 2017 Ambulatory Encounter Report from Baptist
- September 22, 2017 telephone note from Baptist
- November 10, 2017 Ambulatory Encounter Report from Baptist
- November 22, 2017 Ambulatory Encounter Report from Baptist
- May 15, 2018 Ambulatory Encounter Report from Baptist
- June 6, 2018 Ambulatory Encounter Report from Baptist
- July 12, 2018 Ambulatory Encounter Report from Baptist
- October 15, 2018 office note from Megan Wienecke, PA-C
- January 4, 2019 telephone note from Baptist
- January 16, 2019 office note from Megan Wienecke, PA-C

- January 24, 2019 office note from Dr. Amber Graham
- January 28, 2019 office note from Dr. Todd Fountain
- January 31, 2019 EKG, chest x-ray, & laboratory testing

**Appeal Evaluation**

Our role in reviewing Ms. Richardson's file is to determine whether her medical condition and the medical documentation contained in her file supports that she is unable to perform the material and substantial duties of Any Occupation throughout beyond March 22, 2019. Ms. Richardson continued to receive benefits beyond the change in definition. However, benefits beyond May 15, 2019, were denied as the evaluation concluded Ms. Richardson was no longer disabled as defined by the Policy.

During the claim evaluation of ongoing benefits, Ms. Richardson's claim was also reviewed by Dr. Margaret Harvey, an independent physician, Board Certified in Orthopedic Surgery. Based on the review of the medical records, Dr. Harvey stated the medical records support the following diagnoses: cervical radiculopathy and right shoulder SLAP tear. Dr. Harvey stated cervical radiculopathy was the impairing diagnosis. Dr. Harvey further stated:

> "*The claimant is status post an arthroscopic SLAP repair performed by Dr. Dalal on October 23, 2018. Full recovery from this procedure can take up to 6 months. Currently, the claimant is 4 months postoperative and Dr. Dalal recommended restrictions of no lifting with left upper extremity, no performing overhead activity for the dates of October 23, 2018 through February 1, 2019. These restrictions are reasonable after a shoulder arthroscopy. In order to support impairment from February 1, 2019 onward, additional office visits from Dr. Dalal are necessary.*
>
> *Regarding cervical pain, the claimant has consistent documentation of cervical pain with decreased strength in her upper extremities. At the last visit with PA Wienecke, it was documented generalized 4-4-/5 strength. Her latest cervical spine MRI dated October 10, 2018 documented degenerative changes at C4-5, C5-6 with no high grade foraminal compromise. Past treatments have included multiple epidural steroid injections as well as radiofrequency ablation. Reasonable work restrictions due to this diagnosis would be no lifting/pushing/pulling/carrying greater than 25 pounds occasionally, 10 pounds frequently. These should be reassessed in 3-6 months.*

During the claim evaluation of ongoing benefits, Ms. Richardson's claim was also reviewed by Dr. Michael Medlock, an independent physician, Board Certified in Neurological Surgery. Based on the review of the medical records, Dr. Medlock stated the medical records support the following diagnoses: anterior cervical discectomy and fusion and chronic cervical spine pain. Dr. Medlock stated based on the medical documentation on file, the medical records did not support impairment and no restrictions would apply as of April 11, 2019.

The medical information submitted in support of Ms. Richardson's appeal and *not previously on file* included a January 24, 2019 office note from Dr. Amber Graham indicating Ms. Richardson was a new referral. Ms. Richardson was being seen for consideration of trigger point injections. It was noted she had neck pain since 2016. On examination, Ms. Richardson had pain with cervical range

of motion and it was tender to touch in the right cervical region. The impression was neck pain and myofascial pain. Dr. Graham offered trigger point injections. Ms. Richardson agreed to proceed with the injections.

The January 28, 2019 office note from Dr. Todd Fountain stated Ms. Richardson was being seen for a surgical evaluation. She had an MRI of the cervical spine that showed degenerative disc disease most prominent at the right C5 - 6 with compression against the thecal sac particularly the right foraminal and lateral recess. Ms. Richardson's spinal cord showed no significant compression. She had normal strength in the upper and lower extremities. Her reflexes were normal and symmetric. She had a positive spurling's to the right which include C-6 radicular symptoms. She had no pathologic findings, no Babinski and no Hoffman or clonus. Ms. Richardson did have tenderness to palpitation over the cervical musculature particularly over the right posterior cervical musculature. Dr. Fountain's impression was C5 - 6 spondylosis and disk protrusion with right C6 radiculopathy. Dr. Fountain noted Ms. Richardson had tried multiple conservative treatments without benefit. Surgery was discussed and Ms. Richardson agreed to proceed with surgery.

The January 31, 2019 EKG, chest x-ray, & laboratory testing was part of Ms. Richardson's preoperative testing.

During the review of Ms. Richardson's appeal, her claim was reviewed by Dr. Howard Grattan, an independent physician who is Board Certified in Physical Medicine and Medicine/Pain Management. Based on his review of the medical records, Dr. Grattan stated the records supported the following diagnoses: left shoulder joint and superior glenoid labrum lesion of the left shoulder, cervical spondylosis with radiculopathy, and status post cervical fusion on February 13, 2019.

Dr. Grattan stated that functional impairment was supported. Dr. Grattan also indicated Ms. Richardson was recovering from cervical radiculopathy and had no ongoing neurological deficits. Due to her cervical fusion she would have ongoing restrictions and limitations. Dr. Grattan state from a physical medicine and pain perspective, medically necessary restrictions throughout an 8 hour day, and 40 hour week included:

- Lifting, carrying, pushing and pulling 20 pounds occasionally--up to 1/3 of the day and 10 pounds frequently--1/3 to 2/3 of the day
- Sitting 60 minutes continually up to eight hours per day
- No restrictions with walking or standing
- No restrictions with sitting
- No restrictions with use of the lower extremities
- Occasionally--up to 1/3 of the day twisting, bending, and rotating the neck
- Occasionally--up to 1/3 of the day reaching overhead
- No restrictions with reaching at waist level or below
- Fingering, handling, feeling, and grasping is unrestricted

Dr. Grattan stated based on the medical evidence, it supports you have the ability to sustain a full-time capacity within the above-noted restrictions and limitations from May 16, 2019 forward. Dr. Grattan further stated, "*Given the claimant's significant history of multiple bilateral knee surgeries with osteoarthritis, and chronic low back pain the claimant is functionally impaired.*

*During the timeframe under review, the physical exam reveals the claimant has an antalgic gait. Muscle tone is normal. Lumbar motion is without pain. There is hip tenderness, greater trochanteric tenderness and SI joint tenderness on the right side. Strength is 4/5."*

**Vocational Review**

Ms. Richardson's file was *previously* reviewed by a vocational consultant to identify alternative occupations for which she was qualified. This vocational assessment considers her transferable skills compared with her limitations. The results of this report indicate she has acquired, based on her education, training, and work history, the following transferable skills:

**Skills & Abilities:**

Using hands to carry and pull objects of varying weights; performing routine work repeatedly; following simple instructions; working outside; using an assortment of tools and equipment to shovel materials, clean work areas, and oil machinery; and working under hazardous conditions. Applying basic math skills and visual abilities to maintain records, conduct inventories, and estimate quantities; verifying completeness of articles shipped or received; using hands and fingers to pack, store, or sort articles; and lifting and handling bulky materials and products. Using common sense and special skills in attending to the needs of a specific individual or group; following oral and written instructions; using eyes, hands, and fingers to handle equipment and instruments and collect medical data; and adapting to emergencies and frequent changes in job duties.

The Transferable Skills Analysis (TSA) identified occupations within Ms. Richardson's physical abilities and within her identified skill level. The following are examples of occupations Ms. Richardson could perform: Ticket Taker, Usher, Sales Attendant, Laundry Worker III, and Guard (Security).

Following Dr. Grattan's medical evaluation on appeal and the restrictions and limitations outlined in his report, an additional vocational review was conducted. The following occupations remain viable: Sales Attendant, Ticket Taker, and Usher.

This appeal review and analysis considered all the medical and claim documentation contained in Ms. Richardson's LTD administrative record whether or not specifically referenced in this document. We acknowledge Ms. Richardson's diagnoses of left shoulder joint and superior glenoid labrum lesion of the left shoulder, cervical spondylosis with radiculopathy, and status post cervical fusion. Based on the medical evidence on file, the records do provide restrictions and limitations. However, the restrictions and limitations would not preclude Ms. Richardson from performing sustained full-time work within her physical abilities and skill level. We have determined Ms. Richardson does not meet the definition of disability from Any Occupation beyond May 15, 2019. The supported restrictions and limitations outlined in the medical evaluation by Dr. Grattan would not preclude Ms. Richardson from the identified sedentary occupations outlined in the TSA.

Based on our review of the information contained in Ms. Richardson's claim file, we have determined she can perform, with reasonable continuity, the material and substantial duties of the above occupation(s) based on your capacity and skill level. The records do not support she does not have the transferrable skills to perform the occupations. The medical evaluation by Dr. Grattan does not preclude her from the identified occupations outlined in the TSA. The occupation identified in

the TSA remains viable. As a result of technological advancement, employers are providing a variety of workstation types and associated equipment that would allow an individual opportunity to experience and sustain comfort in their respective work settings within the occupations. This would allow you to change positions at will for comfort.

**Conclusion**

We conducted a thorough and independent review of Ms. Richardson's entire claim. In summary, we acknowledge she may have continued to experience some symptoms associated with her conditions beyond May 15, 2019. However, the medical documentation on file does not contain physical examination findings, mental status examination findings, diagnostic test results, or other forms of medical documentation supporting Ms. Richardson's symptoms and impairments remained of such severity, frequency, and duration that they resulted in restrictions or limitations rendering her unable to perform the duties of the occupations identified as being within her functional capacity and vocational skills after May 15, 2019.

After a complete evaluation of the claim, including all information submitted with the appeal, all medical reviews completed on the file, and taking into consideration the opinion of Ms. Richardson's providers as set forth in their written record, we determined the clinical evidence does not support Ms. Richardson is precluded from performing Any Occupation beyond May 15, 2019. Our position remains that Proof of Disability in accordance with the Policy provisions has not been provided, and our original determination to deny benefits is upheld. Therefore, no further benefits are payable.

This claim decision reflects an evaluation of the claim facts and Policy provisions.

**Policy Provisions**

In order to continue receiving benefits, Ms. Richardson must satisfy the requirements of all Policy provisions that state, in part:

***LONG TERM DISABILITY COVERAGE***

***Disability Benefit***

*When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:*

*1. Disability;*
*2. Regular Attendance of a Physician; and*
*3. Appropriate Available Treatment.*

*The Proof must be given upon Liberty's request and at the Covered Person's expense. In determining whether the Covered Person is Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.*

*"**Disability**" or "**Disabled**" means:*

*Applicable to Class 2:*

*b. i. if the Covered Person is eligible for the 24 Month Own Occupation benefit, "**Disability**" or "**Disabled**" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*

*ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.*

*"**Any Occupation**" means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.*

*"**Proof**" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:*

1. *a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;*
2. *an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and*
3. *the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.*

*Proof must be submitted in a form or format satisfactory to Liberty.*

***Discontinuation of the Long Term Disability Benefit***

*The Monthly Benefit will cease on the earliest of:*

*…*
*9. the date the Covered Person is no longer Disabled according to this policy;*

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, Ms. Richardson was entitled to appeal the decision made by Lincoln Financial Group, and to submit any additional information she wished to be considered as part of the appeal. Lincoln Financial Group has conducted a full and fair review of her appeal and accompanying materials, and has concluded that the denial of benefits will be maintained.

At this time, her administrative right to review has been exhausted; no further review will be conducted by Lincoln Financial Group and her claim will remain closed. Ms. Richardson may request to receive, free of charge, copies of all documents relevant to her claim. She has the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

The Nike, Inc.'s Group Disability Income Policy contains the below provision:

**Legal Proceedings**

*A claimant or the claimant's authorized representative cannot start any legal action:*

1. *until 60 days after proof of claim has been given; or*

2. *more than three year(s) after the time proof of claim is required.*

If Ms. Richardson's policy is subject to ERISA, she may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact her local U.S. Department of Labor Office or her state insurance regulatory agency. In addition, once all required reviews of her claim have been completed, she has the right to bring a civil action under applicable law. Ms. Richardson's employer's policy has a contractual limitations period of three years, which means that a lawsuit must be brought within three years after the date written proof of claim or proof of continued disability was required. The date on which the contractual limitations period expires for this claim is September 28, 2022.

Nothing in this letter should be construed as a waiver of any Lincoln Financial Group rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by Lincoln Financial Group are based on the provisions outlined in the Nike, Inc.'s Group Disability Income Policy. These provisions are not contingent on decisions made by either the Social Security Administration or other disability-determining entities. No internal rules, guidelines, protocols, standard or other similar criteria were relied upon in rendering the claim determination.

If Ms. Richardson requires language translation assistance, please contact Lincoln Financial Group to initiate a service provided free of charge to assist with understanding her claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shá ata' hane'go shíká a'doowoł nínízingo saad hosíníłįį' dóó ná'ookąąh nííní'ąągo naaltsoos nííníłtsoozígíí hazho'ó bik'idi'deeshtįįł nínízingo doo bąąh ílínígóó níká a'doowoł éí biniiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

*Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.*

*Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.*

If you have any questions regarding this matter, please contact me.

Sincerely,

Jane Daniell
Appeals Consultant
Phone No.: (888) 437-7611 Ext. 16393
Secure Fax No.: (603) 334-5704